IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                   Criminal Action No. 5:06CR3

BRANDON SCOTT BRADY,

    Defendant.

**REPORT AND RECOMMENDATION
THAT DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND
STATEMENTS BE GRANTED**

I. Introduction

    A.    Background.

Defendant is the only defendant in a one count indictment charging him with being a felon in possession of a firearm.

    B.    The Motion.

Motion to Suppress Physical Evidence and Statements.[1]

    C.    Recommendation.

I recommend the Motion to Suppress Physical Evidence and Statements be granted because defendant had an expectation of privacy in the premises and the officers entered the premises without a search warrant and without consent in the absence of exigent circumstances.

---

[1] Doc. No. 14.

## II. Findings of Fact

A. <u>Standing</u>.

James Morris lives with his son at 69-1/2 Indiana Street, Wheeling, West Virginia. Morris met the defendant in September, 2005. From September, 2005, until December 1, 2005, the day of the defendant's arrest, Morris and defendant started to spend some time with each other. Morris acted as a big brother to defendant. Defendant stayed at Morris' apartment overnight between ten and fifteen times from mid-October, 2005, until December 1, 2005. Sometimes defendant stayed at Morris' apartment when Morris and his son were not there. December 1, 2005, was the Thursday following Thanksgiving. Defendant spent Thanksgiving night and the next night at Morris' house. Deputy Josh Sipos testified defendant had no permanent address and just stayed where ever he could find a place to sleep.

<u>Conclusion of Law</u>.

Defendant had an expectation of privacy in the apartment at 69-1/2 Indiana Street, Wheeling, West Virginia.

B. <u>The Search, Seizure, and Statements</u>. 69-1/2 Indiana Street is one-half of a duplex. Both residences of the duplex have a first floor entrance. The entrance to 69-1/2 is on the left. The entrance door to 69-1/2 is exclusively to that residence. After going through the door, there is a short hall leading to some steps that go up to the living quarters. At the top of the steps is another door with a glass window and a curtain to enter the actual living space. 69-1/2 is the upstairs of the building. The other residence unit with the entrance door to the right of the entrance door of 69-1/2 is the downstairs of the building.

On December 1, 2005, Deputy Josh Sipos was looking for the defendant to arrest him on a warrant issued on an indictment by the Ohio County, West Virginia, Grand Jury. Defendant's mother told Sipos that defendant lived on "the Island" from time to time. There were other anonymous tips that defendant had been seen on "the Island". Sipos went to the Morris residence on Wheeling Island to find defendant about 2:00 p.m. that day. Morris told Sipos that defendant was at the Morris residence the day before (Wednesday, November 30, 2005), but Morris did not know where defendant had spent the night. Morris told Sipos that defendant may have spent the previous evening with Morris' sister[2], and his sister may know where defendant was. At Sipos' request, Morris called his sister. Morris usually used the phone of the person who lived in the downstairs of the duplex, but that person was not home. Morris said Sipos went to a pay phone that would not work. Then Morris went into a neighborhood bar to make the call to his sister. Morris' sister said she did not know where defendant was. Morris asked his sister (Amanda Jones) to come to Morris' house after work. Sipos left the Morris residence and returned to headquarters.

Sipos told his father and Sgt. Goode that Morris' sister was to come to Morris' residence at 3:00 p.m. Sipos, his father, (Corporal Sipos), Deputy Lewis, and Sgt. Goode went to "the Island" to await the arrival of Morris' sister. Sgt. Goode parked his vehicle a short distance from the Morris residence to watch for Ms. Jones to arrive across the bridge from Ohio to Wheeling Island. Goode saw a vehicle come by that matched the description he had been given for the vehicle owned by Ms. Jones. The Jones vehicle stopped at Morris' residence. Sipos, Sipos and Lewis arrived first. Ms. Jones was questioned and advised she did not know where defendant was. She

---

[2] Sipos recalls Morris saying Morris' sister resided in Martins Ferry. Morris testified his sister lived in Bellaire, Ohio.

3

had not seen defendant since the day before. The conversation was just ending as Goode approached the Jones vehicle. Morris was on the scene when Goode arrived. Morris and Ms. Jones were told to call if either learned where defendant was. The deputies left. As they were leaving the scene, they received a page from dispatch that said defendant was in Morris' premises. Dispatch said the call with the information was anonymous. Sgt. Goode called the number of the anonymous caller and talked to one Carla Daniels who informed him that she had talked to the resident of the downstairs half of the duplex. The downstairs resident told Daniels that Morris came to his residence to use the telephone. The resident of the downstairs apartment told Ms. Daniels that Mr. Morris said the deputies are looking for the defendant. The downstairs resident said Morris said the defendant is in my apartment and I don't want to give him up because he's my boy. Ms. Daniels told Goode that the downstairs resident was concerned because the defendant was upstairs with a gun and there were children on the street.

The four deputies returned to the Morris residence. Three went to the front door (Deputy Lewis went to the rear of the residence) and knocked on the front door. Morris came to the door. Sgt. Goode advised Morris they had information that defendant was in Morris' apartment. The deputies at the front door all testified that Morris acknowledged defendant was in the apartment, stepped back, raised his hands, palms outward, in the air (as one would being told to put one's hands up), pointed upstairs and said "He's upstairs and you can go look." Sgt. Goode asked if defendant had any firearms. Morris replied that defendant had a firearm. The deputies went up the stairs, into the apartment and looked for defendant. Ms. Jones was sitting in the living room. She did not respond when asked where defendant was. The deputies cleared the apartment and could not find defendant. After the residence was cleared, Sgt. Goode received another page that

4

defendant was in the attic with a shotgun.  Ms. Jones was escorted downstairs by Sgt. Goode.  Corporal Sipos was sent to the porch.  Deputy Lewis came inside because he had a protective vest.  Some Wheeling police officers arrived.  Sgt. Goode called Lt. Flick, the Special Response Commander.  Flick and Chief Deputy Butler arrived at the scene.  Butler called out and asked defendant if he were in the attic.  Defendant responded.  Defendant requested to see his girlfriend.  Butler asked if defendant had a firearm.  Butler told defendant to drop his gun and then Butler would get his girlfriend.  Ms. Jones was brought back up to the apartment and talked to defendant.  Defendant handed over the ammunition and then the firearm.  Defendant then came down from the attic, was arrested, and cuffed.  The firearm was taken by the deputies.

Deputy Sipos <u>Mirandized</u> defendant at the station and had defendant sign and initial a waiver of each right.  Thereafter, defendant admitted he was hiding in the attic to avoid arrest and possessed the firearm he dropped from the attic.

On January 20, 2006, Special Agent Price of A.T.F. interviewed Morris at Morris' apartment.  Morris told Price that Defendant had no set residence.  Morris told Price that Defendant had brought a firearm to the apartment.  Morris unloaded the firearm and placed it high where his son could not get it.  Morris told Price he gave the officers permission to search the apartment for defendant.

Mr. Morris testified somewhat differently from the deputies.  On Deputy Sipos' first visit on December 1, 2005, Morris said that Deputy Sipos came to the door at the top of the steps without invitation.  Morris said he was instructed by Deputy Sipos not to tell defendant that Sipos was looking for him.  Morris did not want defendant to be arrested in front of Morris' son.  Sipos then instructed Morris to lie to the defendant and get defendant outside the house to avoid having

5

the defendant arrested in front of his son. Otherwise, the testimony of Morris and Deputy Sipos was the same as to Sipos' first visit.

Morris then tried to call his sister from the first floor residence again after Deputy Sipos left. Morris and his sister agreed she would come to Morris' residence after work and they would try to locate defendant.

On the second visit that day by all four deputies, Morris testified that he went downstairs to open the front door for his sister. Morris saw his sister surrounded by the four deputies and crying. Morris was instructed to call the deputies if he came into contact with the defendant. Morris and his sister went into the apartment and started up the steps. His sister's phone rang. Defendant's sister called Morris' sister. Morris said we need to call our mother because the deputies told Morris' sister she would be in trouble if she were harboring defendant. As they proceeded up the steps, Morris saw defendant in the apartment. Morris went down the steps to go to the downstairs residence to ask to use the phone and call his mother. Morris saw the deputies returning to his apartment.

Morris began to open the door. The first deputy stuck his finger in Morris' chest and had the other hand on his gun. The other deputies had their hands on their guns. Morris stepped back and raised his hands. The first deputy said we just received an anonymous call that defendant is in your apartment with a gun. Morris replied, "If he's in there, I'll go get him." The deputy said, "We know he's in there." The deputies then proceeded up the steps without permission.

III. The Motion

    A.    Contentions of the Parties.

Defendant contends the physical evidence seized December 1, 2005 and the statements made by defendant December 1, 2005 must be suppressed because the law enforcement officers entered the residence in which defendant had an expectation of privacy without permission. Defendant further contends that the officers must have a search warrant for the premises notwithstanding that they had an arrest warrant for the defendant, i.e., that warrantless non-consensual entry to a home to make an arrest is prohibited, absent exigent circumstances.

The Government contends that defendant had no expectation of privacy in the premises and therefore, no standing to challenge the entry. The Government further contends the officers had consent to enter the premises from the tenant Morris. Finally, the Government contends even if the officers did not have consent to enter the premises, the fact that defendant had no expectation of privacy in the premises prevents him from claiming an unreasonable search and seizure.

    B.    Discussion.

    1.    Standing. To challenge a search under the Fourth Amendment, a defendant must have an expectation of privacy. Rakas v. Illinois, 439 U.S. 128,143 (1978). Defendant had no permanent residence. Defendant resided overnight in the premises ten to fifteen times from mid-October to December 1, 2005. Defendant was sometimes in the premises when the tenant, Morris, was not. Overnight guests have an expectation of privacy in the premises where they are staying. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). It would appear defendant was in the premises at will from the tenant, Morris, and therefore had an expectation of privacy in the premises.

2. <u>The search, seizure and statements</u>. While warrantless searches are generally prohibited (<u>Katz v. United States</u>, 397 U.S. 347 (1967)), a search pursuant to a valid consent is a well recognized exception. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). A third party with apparent authority over premises may consent to its search. <u>United States v. Matlock</u>, 415 U.S. 164,170 (1974). The issue here is whether Morris gave the officers consent to search. Unfortunately, either the three deputies or Mr. Morris are being less than candid with the court concerning the events at the third visit to the Morris residence on December 1, 2005. The testimony of the two sides on the issue of consent is not reconcilable. This is a close call which could go either way. Morris is a credible witness. Morris' version of the facts would on balance be more likely to have occurred. Officers make a third visit to the premises to arrest a suspect and believe that Morris has not been truthful with them. It would be understandable that they would run by Morris and into the apartment without consent to capture a fugitive who has eluded them, especially when they believed Morris had not been truthful with them. Morris' background and demeanor would suggest that his version of the events took place. The warrantless entry of the premises in which defendant had an expectation of privacy by the officers without consent would seem to be squarely within the decision in <u>Steagald v. United States</u>, 451 U.S. 204 (1981). The statements made by defendant, although after a <u>Miranda</u> warning, are nonetheless to be suppressed since they flowed from the unlawful search and seizure of the residence and are therefore involuntary. <u>Dunaway v. New York</u>, 442 U.S. 200, 217-19 (1979).

C. <u>Recommendation</u>. I recommend the items seized and the statements made by the defendant December 1, 2005 be suppressed because defendant had an expectation or privacy in the

premises and the officers entered the premises without a search warrant and without consent in the absence of exigent circumstances.

Because the trial is set for April 18, 2006, any objections to this Report and Recommendation must be filed by **Tuesday, April 11, 2006**, in writing with the Clerk of the Court identifying the portions of the Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: April 4, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE