IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                        Civil Action No. 5:06CR3
                                                             (STAMP)

BRANDON SCOTT BRADY,

       Defendant.

**MEMORANDUM OPINION AND ORDER**
**AFFIRMING IN PART AND OVERRULING IN PART**
**REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE**
**AND, THEREBY, DENYING DEFENDANT'S MOTION TO SUPPRESS**

I.  Procedural History

On February 7, 2006, the defendant, Brandon Scott Brady ("Brady"), was named in a one-count indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(e). On March 20, 2006, Brady filed a motion to suppress physical evidence and defendant's statements, to which the United States responded.

On April 4, 2006, United States Magistrate Judge James E. Seibert, following an evidentiary hearing on Brady's motion to suppress conducted on March 31, 2006, filed a report recommending that the motion to suppress physical evidence and statements be granted because Brady had an expectation of privacy in the premises and the officers entered the premises without a search warrant and without consent in the absence of exigent circumstances.

Magistrate Judge Seibert informed the parties that if they objected to any portion of this report, they must file written objections within ten days after being served with copies of his report. The government filed objections to the report and recommendation on April 11, 2006, to which Brady filed a response.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must conduct a de novo review of any portion of the magistrate judge's recommendation to which objection is made. As to those portions of a report and recommendation to which no objection is made, a magistrate judge's findings and recommendation will be upheld unless they are "clearly erroneous." Because objections have been filed, this Court has made an independent de novo consideration of all matters now before it, and is of the opinion that the magistrate judge's report and recommendation should be affirmed in part and overruled in part and that the defendant's motion to suppress should be denied.

## II. Facts

James Morris ("Morris") has resided at a duplex at 69-1/2 Indiana Street, Wheeling, West Virginia ("residence") since July 2005. Morris and his son are named on the lease and Morris pays the rent.

Morris met Brady in September 2005. Brady began visiting Morris' residence in the middle to later part of September 2005. Morris stated that he looked at Brady as a "member of the family.

. . ." (Hr'g Tr. at 7 ¶ 17, Mar. 31, 2006.) In the beginning of October 2005, Brady began occasionally spending the night at Morris' residence. Brady stayed overnight at the residence between ten to fifteen times from October 2005 until December 1, 2005. As Morris stated, Brady came to the residence for "a little peace and quiet time . . . ." (Hr'g Tr. at 12 ¶ 2-3.) Often Brady would bring toiletries with him in a book bag or plastic bag. Sometimes Brady would stay in the residence when Morris was at work and would wash dishes and clean the residence. Brady did not have a designated room and either slept on the couch in the living room or on a spare mattress in Morris' sons' room. Brady spent Thanksgiving night and the next night at Morris' residence.

On December 1, 2005, the Ohio County Sheriff's Department had a warrant for Brady's arrest that was issued on an indictment by the Ohio County, West Virginia Grand Jury. Later that day, Ohio County Sheriff's Deputy Josh Sipos ("Sipos") received an anonymous tip that Brady was seen on Wheeling Island in the vicinity of 71 Indiana Street. Brady's mother also told Deputy Sipos that Brady lived on "the Island from time to time." (Hr'g Tr. at 30.) Deputy Sipos went to the Morris residence to find Brady around 2:00 p.m. that day.

Deputy Sipos knocked on Morris' front door and asked Morris to step outside. Morris told Deputy Sipos that Brady had been at the residence the day before but that he did not know where Morris had

3

spent the previous night or where he was at the moment. Deputy Sipos asked Morris to call his sister to ask if she might know where Brady was located. Morris' sister, Amanda Jones ("Jones"), stated that she did not know where Brady was located at that time. Morris requested his sister's presence at his residence after work (after 3:00 p.m.) that day. Deputy Sipos left the residence and returned to the police station.

Deputy Sipos advised Sergeant Goode and Corporal Sipos[1] that Jones was going to "show up" at Morris' residence and that Brady may be with her. Id. Deputies Sipos and Lewis, Sergeant Goode and Corporal Sipos then went to the vicinity of Morris' premises to await Jones' arrival. When Jones' vehicle approached the vicinity, all four officers approached Jones to question her. Jones stated that she had not been in contact with Brady for about two days. The four officers then questioned Morris again and Morris stated that Brady had been there the night before and that he still did not know where he was. After the officers questioned Jones and Morris, the officers left the vicinity. However, they immediately returned to Morris' residence based upon an anonymous tip that Brady was inside Morris' residence. Sergeant Goode telephoned the number of the anonymous caller and the caller informed him that her name was Carla Daniels ("Daniels") and that she was calling on behalf of the person who lived in the downstairs half of the duplex

---

[1] Corporal Sipos is Deputy Sipos' father.

4

where Morris resided. Daniels informed Sergeant Goode that the downstairs resident had talked to Morris and that Brady was in Morris' apartment with a gun.

Based upon this information, the four officers returned to Morris' residence. Sergeant Goode, Deputy Sipos and Corporal Sipos knocked on Morris' front door and informed Morris that they had information that Brady was in his residence. Morris responded by stepping back and saying "He is upstairs, you can go get him." (Hr'g Tr. at 40.)

The officers went into the residence and could not find Brady. The officers found Jones sitting on a couch in the living room of the residence. When questioned by the officers, Jones did not say anything. While still inside the residence, the officers then received a pager message that "he [Brady] was in the attic with the gun." (Hr'g Tr. at 68.) After the pager message was received, Sergeant Goode escorted Jones out of the residence. Deputy Lewis came inside from the back of the house. Additional officers arrived at the residence.

Sergeant Goode telephoned Lieutenant Flick, a Special Response Commander, who arrived at the residence. Chief Deputy Butler arrived a few moments later. Chief Deputy Butler went into Morris' bathroom doorway to talk to Brady, who was thought to be in the attic. Brady stated that he wanted to see his girlfriend. Chief Deputy Butler ordered Brady to first drop any weapons he might

5

have. Brady first lowered down the rounds out of the shotgun and then lowered down the shotgun as instructed by Chief Deputy Butler. Brady then came down from the attic and was handcuffed and arrested.

Deputy Sipos advised Brady of his Miranda rights at the station and Brady then signed and initialed a waiver of each right. Miranda v. Arizona, 384 U.S. 436 (1966). Afterwards, Brady admitted to hiding in the attic to avoid arrest. Brady further stated that he possessed the firearm that he had dropped from the attic.

On January 20, 2006, Special Agent Joe Price ("Price") interviewed Morris at his residence. Agent Price testified that Morris told him that "I gave them [the officers] permission to come in." (Hr'g Tr. at 110.)

Morris' testimony at the evidentiary hearing differs to some degree from the officers' testimony stated above. Morris asserts that on December 1, 2005, Deputy Sipos came to his front door at the top of his steps without invitation. Morris states that Deputy Sipos instructed him not to tell Brady that the officers were looking for him. Morris alleges that Deputy Sipos then instructed Morris to lie to Brady and to lure him outside so the officers could arrest him.

Morris testified that, later that day, he went downstairs to open the front door for his sister. When he looked outside, his

sister was surrounded by four deputies and she was extremely upset to the point that she was crying. The deputies instructed Morris to contact them if he saw Brady. The deputies left the residence. When Morris and his sister went inside the residence, they discovered Brady in the kitchen. Morris went downstairs to contact his mother to determine the next course of action and saw the officers returning to his residence.

When Morris saw the officers returning to his residence, he began to open his front door. Morris asserts that the first deputy started to enter his residence and then placed his finger in Morris' chest and had the other hand on his gun. Morris states that all of the other officers also had their hands on their guns. Morris stepped back from the officers and raised his hands. The first deputy stated that they had received an anonymous tip that Brady was in Morris' residence with a gun. Morris replied, "If he's in there, I'll go get him." (Hr'g Tr. at 127.) Morris asserts that the officers proceeded into his residence without his permission. Morris testified that he did not say anything else to the officers.

### III. Discussion

In his motion to suppress physical evidence and statements, Brady argues that: (1) the physical evidence seized on December 1, 2005; and (2) the statements made by Brady on December 1, 2005 should be suppressed because the law enforcement officers entered

Morris' residence, in which Brady had an expectation of privacy, without a search warrant or without consent. Further, Brady asserts that no exigent circumstances existed that would excuse the warrantless search.

In his report, Magistrate Judge Seibert recommended that Brady's motion to suppress physical evidence and statements be granted because Brady has an expectation of privacy in the residence, the officers entered the residence without the consent of Morris, and the officers had no justification due to exigent circumstances for the warrantless entry.

The government asserts in its objections to the magistrate judge's report and recommendation that: (1) the defendant lacked standing to contest the search; (2) the magistrate judge abused his discretion in concluding that the deputies had entered the apartment without consent; (3) the magistrate judge's reliance on Steagald v. United States is misplaced; and (4) even without consent, a warrantless entry would have been justified under a theory of exigent circumstances.

A.  Standing

A person may challenge a search of another person's residence, even when the resident is present. See Rakas v. Illinois, 439 U.S. 128 (1978)(to assert a Fourth Amendment challenge, one must establish that he or she had a legitimate expectation of privacy in the area searched); Minnesota v. Olson, 495 U.S. 91 (1990)(an

overnight guest in a home has a legitimate expectation of privacy in the premises). In <u>Olson</u>, the Supreme Court held that an overnight guest in his girlfriend's home could challenge the police entry of the premises, notwithstanding the fact that the defendant did not have a key, was not left alone and lacked control over the premises. <u>Id.</u> Moreover, the Supreme Court of South Carolina, in <u>State v. Missouri</u>, 603 S.E.2d 594 (S.C. 2004), held that a defendant who was good friends with the host, had frequently visited the apartment and spent the night several times, described the apartment as a place to "find comfort" at times, had a key to the apartment, and kept a change of clothes there, had an expectation of privacy in the apartment. <u>Id.</u> at 597-8. <u>See also</u> <u>Olson</u>, 495 U.S. at 91.

The facts of this case are similar to those in <u>Missouri</u>, 603 S.E.2d at 594, and <u>Olsen</u>, 495 U.S. at 91. Brady stayed overnight at Morris' apartment between ten to fifteen times from October 2005 until December 1, 2005. As Morris stated, Brady came to Morris' apartment for "a little peace and quiet time . . . ." (Hr'g Tr. at 12 ¶ 2-3.) Often Brady would bring toiletries with him in a book bag or plastic bag. Sometimes Brady would stay in the duplex when Morris was at work and would wash dishes and clean the duplex.

It is apparent to this Court that Brady had an expectation of privacy in Morris' residence. Accordingly, Brady has standing to challenge the search at issue.

9

B.   Consent

Warrantless searches are per se unreasonable.  One exception to the warrant requirement is the search is made following consent by the person with an interest in the property.  A warrantless consent search is invalid if an officer exceeds the scope of the consent granted.  Wayne R. Lafave, Search and Seizure § 8.1(c) (4th ed. 2004).  In United States v. Matlock, 415 U.S. 164 (1974), the court held that a warrantless search is constitutionally valid if the police obtain consent from a person who possesses common authority over the property searched.  Further, the Court in Steagald v. United States, 451 U.S. 204 (1981), ruled that a person whose residence is searched for the presence of a guest is entitled, absent an emergency or consent, to a prior judicial determination of probable cause to search the premises for the person to be arrested (emphasis added).

Moreover, the Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218 (1973), held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances."

In his report, the magistrate judge found that the officers entered Morris' residence without a search warrant and without consent.  The government argues, in its objection to the report and

recommendation, that Morris consented to the search of his premises.

Following a review of all of the testimony taken at the evidentiary hearing, this Court finds the government's argument on the issue of consent persuasive. While the testimony of Morris at the hearing differs somewhat from the testimony of the officers, this Court finds that the officers' testimony, along with some of the facts stated by Morris, lead this Court to conclude that Morris gave the officers consent to search his residence.

Sergeant Goode testified that he requested to search Morris' residence and that Morris stepped back from his front door and stated "He is up there, go ahead." (Hr'g Tr. at 85.) Deputy Sipos testified that he heard Morris tell Sergeant Goode that "He [Brady] is upstairs, you can go get him." (Hr'g Tr. at 40.)

Deputy Sipos, Corporal Sipos and Sergeant Goode testified that they believed Morris, through his words and actions, was giving them permission to enter his residence. Agent Price testified that Morris told him in an interview in January 2006 that "I gave them [the officers] permission to come in." (Hr'g Tr. at 110.) Morris testified at the hearing that when the officers came to his front door, he stepped back from the officers and raised his hands. While Morris testified at the hearing that he did not consent to the officers entering his residence, he did not voice an objection to the officers when they entered his residence.

This Court notes that Agent Price was able to discuss the events of December 1, 2005 with Morris during an interview in January 2006. The facts Morris stated to Agent Price differ somewhat from the facts that Morris stated at the suppression hearing on March 31, 2006. Thus, this Court must weigh Morris' testimony in light of all the evidence presented.

Finally, there is no allegation that Morris' consent to the search was the product of duress or coercion.

Accordingly, this Court finds that there was sufficient credible evidence that Morris consented to the search of his residence. Further, the statements made by Brady were after he was given his Miranda warning, and thus, are admissible. Miranda v. Arizona, 384 U.S. 436 (1966).

C. Exigent Circumstances

Although this Court finds that Brady's motion to suppress must be denied, it will address the government's argument that exigent circumstances existed.

"[B]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welch v. Wisconsin, 466 U.S. 740, 750 (1984)(citing Payton v. New York, 445 U.S. 573, 586 (1980)).

12

Exigent circumstances can justify a warrantless entry of a residence to make an arrest. Based upon the standard set forth in Minnesota v. Olson, 495 U.S. 91 (1990), the police officers may nonconsenually enter a residence without a warrant in hot pursuit of a felon, or if they have probable cause to believe that if they do not enter immediately: (1) evidence will be destroyed; (2) the suspect will escape; or (3) harm will result to police officers or others. The police officers must establish that probable cause existed "to believe that one or more of the other factors justifying the entry were present and that in assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered." Id. at 100.

The government argues that even if Morris did not give consent to search his residence, it would still have been reasonable for the deputies to enter the premises and search based upon exigent circumstances. This Court finds the government's argument unpersuasive.

First, there was no allegation that evidence would be destroyed if Brady was not immediately apprehended. Second, the government has provided insufficient evidence to show that the suspect would escape from the area. It is evident that Brady was not going to flee. If Brady had come out of Morris' residence, he would have been promptly apprehended by the officers waiting outside. Third, the government has failed to provide sufficient

proof that the situation was dangerous either to the police officers or to others in the vicinity.  Although the officers believed Brady had a firearm, there was no reason for the officers to believe that anyone was in danger.  Brady did not brandish his weapon or threaten to use force against anyone.  The fact that Brady might have a firearm, without more, is insufficient to establish that exigent circumstances existed.

Accordingly, there were no exigent circumstances in this criminal action to warrant a nonconsenual warrantless search.

V. Conclusion

After a de novo review, this Court concludes that the magistrate judge is affirmed in part and overruled in part. Accordingly, the government's objections to the magistrate judge's report and recommendation are hereby SUSTAINED in part and OVERRULED in part.  Defendant Brandon Scott Brady's motion to suppress is, for the reasons stated above, DENIED.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to the defendant and to counsel of record herein.

DATED:   May 24, 2006

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE